IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

QIN LI,                          )      CIVIL 14-00573 LEK-RLP
                                 )
            Plaintiff,           )
                                 )
      vs.                        )
                                 )
CITY AND COUNTY OF HONOLULU,     )
                                 )
            Defendant.           )
_____)

**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE
LATE OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
FILED ON MARCH 8, 2017; AND GRANTING IN PART AND
<u>DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

            Before the Court are: Defendant City and County of
Honolulu's ("Defendant") Motion for Summary Judgment, filed on
March 8, 2017; and Plaintiff Qui Li's ("Plaintiff") motion
seeking leave to file a late memorandum in opposition to the
Motion for Summary Judgment ("Motion for Leave"), filed on
April 14, 2017.  [Dkt. nos. 57, 67.]  The Court finds these
matters suitable for disposition without a hearing pursuant to
Rule LR7.2(d) of the Local Rules of Practice of the United States
District Court for the District of Hawai`i ("Local Rules").

            Plaintiff's Motion for Leave is denied, and Defendant's
Motion for Summary Judgment is denied as to Plaintiff's claim
that her termination was in retaliation for engaging in protected
activity, and the motion is granted as to all of Plaintiff's
other claims.

## **BACKGROUND**

Plaintiff filed her Complaint on December 22, 2014. The Complaint alleges that Defendant terminated Plaintiff's employment because of her national origin – Chinese – and in retaliation for her complaints about workplace discrimination. [Complaint at ¶ 3.] The Complaint alleges the following claims: discrimination based on national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* ("Count I"); intentional infliction of emotional distress ("IIED" and "Count II"); and retaliation, in violation of 42 U.S.C. § 12203 ("Count III"). Plaintiff prays for the following relief: reinstatement her employment; general damages; special damages, including back pay, front pay, and other expenses; punitive damages; attorneys' fees and costs; interest; and any other appropriate relief.

The following facts are relevant to the Motion for Summary Judgment. In June 2013, Defendant hired Plaintiff as a Driver Licensing Clerk ("Clerk") at the Kapalama/City Square Office ("Kapalama Office"). Jacqueline Windrath – the Supervising Clerk at the Kapalama Office – interviewed Plaintiff for the position and recommended that Defendant hire her. At the time of the interview, Ms. Windrath was aware that Plaintiff is

of Chinese descent.  [Def.'s Separate & Concise Statement of Facts ("Def.'s CSOF"), filed 3/8/17 (dkt. no. 55), at ¶¶ 1-3.[1]] Ms. Windrath states that her own "race is Chinese, Japanese, Filipino, and Spanish."  [Def.'s CSOF, Decl. of Jacqueline Windrath ("Windrath Decl.") at ¶ 3.]

In 2013, Defendant hired eleven new Clerks for the Kapalama Office.  Six of the eleven new Clerks were hired during June and July.  Four of the eleven new Clerks were government transfers.  During the relevant period, unless a new Clerk was a government transfer, he or she had a probationary review after approximately three months, and another after approximately six months.  These reviews included a meeting between Ms. Windrath and the Clerk, during which they discussed any errors the Clerk made, how the Clerk could improve, and how the Clerk could satisfactorily complete the probationary period.  [Id. at ¶¶ 5-6.]  During the relevant period, Ms. Windrath also discussed Clerk errors and/or performance problems during counseling sessions so that the Clerk had the opportunity to correct the errors and/or problems.  Prior to the end of the six-month probationary period, Ms. Windrath recommended whether the Clerk should be given permanent employment status, be terminated, or have his or her probationary period extended.  [Id. at ¶¶ 8-9.]

---

[1] For the reasons stated *infra* Discussion Section I, the statements of fact in Defendant's CSOF are deemed admitted.

Plaintiff and the six other Clerks hired in 2013 who were not government transfers received the three-month and six-month probationary reviews. [<u>Id.</u> at ¶ 7.] In Plaintiff's three-month Probationary Performance Evaluation Report ("Three-Month PPER"), signed on September 4, 2013, Ms. Windrath rated Plaintiff's overall performance as satisfactory. Specifically, Ms. Windrath rated Plaintiff's work-quality, work-quantity, reliability and initiative, relationships with others, and job knowledge as satisfactory. [Windrath Decl. at ¶ 31 (authenticating Exhibit 5); Def.'s Second Suppl. to Def.'s CSOF ("Second Supplement"), filed 3/10/17 (dkt. no. 61), Exh. 5.[2]] In the comments section of the Three-Month PPER, Ms. Windrath described Plaintiff as "very pleasant when serving the public." [Second Supplement, Exh. 5.] Although she considered Plaintiff's work to be satisfactory "for a person at th[at] stage of training," Ms. Windrath counseled Plaintiff about "numerous errors she made." [Windrath Decl. at ¶¶ 28, 30.] These errors included problems with accuracy, completeness, and following procedure. [<u>Id.</u> at ¶ 30; Second Supplement, Exh. 4 (Employee Performance Evaluation Worksheet ("EPEW") documenting

---

[2] At the time Defendant filed its CSOF, it intended to file Plaintiff's Three-Month PPER, and other exhibits, under seal, but this Court denied Defendant's motion to file the exhibits under seal. [Dkt. no. 60.] Defendant filed the Second Supplement after the denial of its motion to file the exhibits under seal.

Ms. Windrath's 9/4/13 counseling session with Plaintiff).]

During Plaintiff's six-month probationary period, Plaintiff "had serious and numerous performance deficiencies for which she was counseled on multiple occasions." [Def.'s CSOF at ¶ 10; Windrath Decl. at ¶¶ 34, 38, 40, 42, 45; Second Supplement, Exh. 6 (EPEW for 9/18/13 counseling session), Exh. 7 (EPEW regarding incident between Plaintiff and a licensing applicant on 10/7/13 ("10/7/13 Incident")), Exh. 8 (EPEW documenting Ms. Windrath's 10/8/13 counseling session with Plaintiff regarding the 10/7/13 incident), Exh. 9 (EPEW for 10/14/13 counseling session), Exh. 10 (EPEW for 11/19/13 counseling session).] During the counseling sessions, Plaintiff was argumentative, but she indicated a desire to change. Ms. Windrath therefore recommended that Plaintiff's probationary period be extended in lieu of termination of employment. [Def.'s CSOF at ¶¶ 11-12; Windrath Decl. at ¶ 68, Exh. 17 at 1 (Pltf.'s Six-Month PPER, signed 12/12/13).] In Plaintiff's Six-Month PPER, Ms. Windrath rated Plaintiff's work-quality, work-quantity, relationships with others, job knowledge, and overall performance as substandard. [Windrath Decl., Exh. 17 at 1.]

Based on Ms. Windrath's recommendation, Defendant extended Plaintiff's probationary period for an additional three

months.[3]  However, Plaintiff continued to perform poorly and to make mistakes.  [Def.'s CSOF at ¶¶ 13-14; Windrath Decl. at ¶¶ 51-52, 54, 56; Second Supplement, Exh. 12 (EPEW for 1/13/14 counseling session), Exh. 13 (EPEW for 1/14/14 counseling session), Exh. 14 (EPEW for 1/29/14 counseling session), Exh. 15 (EPEW for 2/6/14 counseling session).]  Defendant submitted documents and records that Ms. Windrath provided to Plaintiff during the various counseling sessions so that Plaintiff could see the errors that she had made.  [Windrath Decl. at ¶ 58, Exh. 16.]

Prior to the completion of Plaintiff's additional three-month probationary period, Ms. Windrath submitted a PPER recommending Plaintiff's termination ("Nine-Month PPER").[4]  [Id. at ¶ 68, Exh. 17 at 2-3.]  Ms. Windrath again rated Plaintiff's work-quality, work-quantity, relationships with others, job knowledge, and overall performance as substandard.  [Windrath Decl., Exh. 17 at 2.]  Defendant ultimately terminated Plaintiff's employment "because of her continued poor performance and rudeness."  [Def.'s CSOF at ¶ 15.]  According to Defendant,

---

[3] Plaintiff was unhappy with the extension of her probationary period, and she asked Ms. Windrath to re-evaluate her.  [Windrath Decl. at ¶ 52.]

[4] The additional probationary period was from December 17, 2013 to March 16, 2014, but Ms. Windrath signed the Nine-Month PPER on February 25, 2014.  [Windrath Decl. Exh. 17 at 2.]

there was no disparity between how Plaintiff was treated and how other probationary Clerks were treated. In fact, Defendant gave Plaintiff favorable treatment. [Id. at ¶¶ 16-17.] Ms. Windrath has recommended the termination of other employees after their six-month probationary period when their performance was not satisfactory. [Windrath Decl. at ¶¶ 47-48; Second Supplement, Exh. 11 (PPER recommending termination of another employee).] In spite of the history of terminating Clerks who under-performed during probation, both Plaintiff and another Clerk hired in June 2013 were allowed an additional three-month probationary period to improve. The other Clerk who had an extended probationary period was of Filipino descent. [Windrath Decl. at ¶ 26.]

Ms. Windrath and Director Sheri Kajiwara – who is also of Chinese descent – state that they did not know about Plaintiff's protected activity before they made the decision to terminate Plaintiff's employment, and they did not retaliate against her for engaging in protected conduct.[5] [Def.'s CSOF at ¶¶ 18-19.] Ms. Windrath has denied having "discriminatory animus against people of Chinese descent/origin." [Id. at ¶ 20.]

---

[5] Sheri Kajiwara is the Director of the City's Department of Customer Services. [Def.'s CSOF, Decl. of Sheri T. Kajiwara ("Kajiwara Decl.") at ¶ 1.] Director Kajiwara signed the letter notifying Plaintiff that her employment was being terminated. [Id. at ¶ 11.]

Ms. Windrath also denies fabricating any claims against Plaintiff. [Id. at ¶ 22.]

Defendant seeks summary judgment as to all of the claims in the Complaint.

**DISCUSSION**

**I. Motion for Leave**

Defendant's Motion for Summary Judgment was originally scheduled for hearing on April 17, 2017. Local Rule 7.4 states, in pertinent part: "An opposition to a motion set for hearing shall be served and filed not less than twenty-one (21) days prior to the date of hearing." However, because twenty-one days before April 17, 2017 was March 27, 2017, which was a legal holiday, Plaintiff's opposition was due on March 24, 2017. See Local Rule LR6.1.

On March 27, 2017, Plaintiff's counsel filed a response to the Motion for Summary Judgment, stating that counsel prepared a memorandum in opposition, but did not file it because Plaintiff failed to come to counsel's office to sign a declaration necessary to the memorandum in opposition. Counsel stated that they would be filing a motion seeking a continuance of the hearing on the Motion for Summary Judgment. As of April 4, 2017, however, Plaintiff's counsel had not filed a motion seeking a continuance of the hearing. This Court therefore issued an

entering order finding that Defendant's Motion for Summary Judgment was unopposed, vacating the hearing, and taking the motion under advisement ("4/4/17 EO"). [Dkt. no. 66.] The 4/4/17 EO also stated that, in light of Plaintiff's failure to file a concise statement of facts responding to Defendant's CSOF, this Court deemed all statements of material fact in Defendant's CSOF to be admitted. See Local Rule LR56.1(g) ("For purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party."). Plaintiff's Motion for Leave followed.

The Motion for Leave includes the Declaration of Charles H. Brower ("Brower Declaration"). Mr. Brower states that he left the state on a trip on the night of March 24, 2017, but Plaintiff's response to Defendant's CSOF and Plaintiff's declaration were prepared for filing prior to his departure. Plaintiff was instructed to come to Mr. Brower's office on March 27, 2017 to sign her declaration, but she later informed Mr. Brower that she could not do so and that she wanted to meet with him to review the declaration before signing it. [Brower Decl. at ¶¶ 2-5.] Mr. Brower states that, "[d]ue to the aforesaid trip, [he] could not meet with Plaintiff before March 27, 2017." [Id. at ¶ 6.] Mr. Brower met with Plaintiff on April 11, 2017, and she signed her declaration. [Id. at ¶ 7.]

Plaintiff's declaration – including its exhibits – and
Plaintiff's response to Defendant's CSOF are attached to the
Brower Declaration as Exhibits 1 and 2, respectively.

> Fed. R. Civ. P. 6(b)(1) states:
>
> When an act may or must be done within a specified
> time, the court may, for good cause, extend the
> time:
>
> > (A)  with or without motion or notice if the
> > court acts, or if a request is made, before
> > the original time or its extension expires;
> > or
> >
> > (B)  on motion made after the time has
> > expired if the party failed to act because of
> > excusable neglect.

In the instant case, Plaintiff's memorandum in opposition to the
Motion for Summary Judgment and her response to Defendant's CSOF
were due by March 24, 2017, but Plaintiff did not file the Motion
for Leave until April 14, 2017.  Thus, Plaintiff must show that
her failure to take timely action was the result of excusable
neglect.  This district court has stated:

> To determine whether a party's failure to meet a
> deadline constitutes excusable neglect, courts
> must examine: (1) the danger of prejudice to the
> opposing party; (2) the length of the delay and
> its potential impact on the proceedings; (3) the
> reason for the delay; and (4) whether the movant
> acted in good faith.  See Pioneer Inv. Servs. Co.
> v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380,
> 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993);
> Comm. for Idaho's High Desert, Inc. v. Yost, 92
> F.3d 814, 825 n.4 (9th Cir. 1996) (concluding that
> the Pioneer test applies to Rule 6(b) motions).

Dawkins v. City & Cty. of Honolulu, Civ. No. 10-00086 HG-KSC,

2012 WL 1536111, at *3 (D. Hawai`i Apr. 27, 2012).

Defendant would not be prejudiced if this Court granted the Motion for Leave because this Court would allow Defendant to file a reply. Further, while this Court does not condone Plaintiff's and her counsel's failure to abide by the applicable deadlines, the twenty-one-day delay between the deadline for Plaintiff's response to the Motion for Summary Judgment and the filing of her Motion for Leave would not have a significant impact on the proceedings. Thus, the first and second <u>Pioneer</u> factors weigh in favor of a finding of excusable neglect.

As to the reason for the delay, it is understandable that Plaintiff wanted to meet with Mr. Brower – who appears to be the lead counsel for Plaintiff – before signing her declaration, and this Court does not fault Mr. Brower for taking a trip. However, Mr. Brower should have prepared Plaintiff's declaration with sufficient time before his trip to allow him to meet with her before his departure. He asserts that he could not meet with Plaintiff before March 27, 2017 because of his trip,[6] but he does not explain why the trip prevented him from meeting with Plaintiff prior to his departure on March 24, 2017. Moreover, even if the trip did prevent Mr. Brower from meeting with Plaintiff prior to his departure, Mr. Brower could have requested

---

[6] As previously noted, by March 27, 2017, Plaintiff's response to the Motion for Summary Judgment was already late.

a continuance of the hearing and an extension of the deadline to file Plaintiff's opposition.  Further, Mr. Brower's co-counsel, Michael Healy, Esq., filed the Response on March 27, 2017, and there is no explanation in the record why Mr. Healy could not have filed a motion for a continuance instead of filing the Response.  As previously noted, Plaintiff never filed the motion for a continuance referred to in the Response.  This Court therefore finds that the third <u>Pioneer</u> factor – the reason for the delay in filing the Motion for Leave – weighs against Plaintiff.

For similar reasons, this Court also finds that there is insufficient evidence in the record to support a finding that Plaintiff and her counsel have acted in good faith in responding to Defendant's Motion for Summary Judgment.  This Court therefore finds that the fourth <u>Pioneer</u> factor – whether the moving party has acted in good faith – weighs against Plaintiff.

This Court acknowledges that it is a close question whether there was excusable neglect in this case.  This Court has carefully considered the two factors that weigh in favor of a finding of excusable neglect and the two factors that weigh against it.  Under the circumstances of this case, this Court finds that the two factors weighing against a finding of excusable neglect are the more persuasive factors.  This Court therefore finds that Plaintiff's failure to file either her

memorandum in opposition to the Motion for Summary Judgment or a motion for a continuance was not the result of excusable neglect. This Court, in the exercise of its discretion, declines to extend the deadline for the filing of Plaintiff's memorandum in opposition to Defendant's Motion for Summary Judgment and Plaintiff's response to Defendant's CSOF. Plaintiff's Motion for Leave is denied.

In light of Plaintiff's failure to file a concise statement of facts responding to Defendant's CSOF, this Court deems all statements of material fact in Defendant's CSOF admitted. <u>See</u> Local Rule LR56.1(g) ("For purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party.").

## II. <u>Title VII Discrimination Claim</u>

Plaintiff's Count I is titled "NATIONAL ORIGIN DISCRIMINATION."[7] [Complaint at pg. 4.] Title VII prohibits employers from, *inter alia*, "discharg[ing] any individual, or

---

[7] Count I also states that Title VII "prohibits discrimination and termination due to national origin and based on **retaliation for complaining of the discrimination.**" [Complaint at ¶ 19 (emphasis added).] However, in light of the title of Count I and the fact that Count III alleges a retaliation claim, this Court does not construe Count I as alleging a retaliation claim.

otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Count I alleges that Plaintiff was subjected to various forms of disparate treatment during her probationary period, including having her probation extended and ultimately being terminated, because she is Chinese. [Id. at ¶¶ 7-17.] This district court has stated:

> A plaintiff may establish disparate treatment in violation of . . . Title VII through direct evidence or, alternatively, through the familiar McDonnell Douglas burden shifting framework. See Surrell v. California Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (discussing standard with respect to Title VII and [42 U.S.C.] § 1981 claims). . . .
>
> The framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), begins by requiring a plaintiff to establish a prima facie case of discrimination. The degree of proof required to establish a prima facie case for summary judgment is minimal. See Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094 (9th Cir. 2005). A prima facie case of disparate treatment requires a plaintiff to establish that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position in issue; (3) the plaintiff suffered an adverse employment decision; and (4) one or more employees outside the protected class with comparable qualifications and work records did not suffer similar adverse employment decisions. See, e.g., White v. Pac. Media Grp., Inc., 322 F. Supp. 2d 1101, 1110 (D. Haw. 2004).

A plaintiff must demonstrate that his or her situation is similar in all material respects to that of employees who received more favorable treatment. <u>See</u> <u>Moran v. Selig</u>, 447 F.3d 748, 755 (9th Cir. 2006). However, "a plaintiff is not obligated to show disparate treatment of an **identically** situated employee." <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 54 (2d Cir. 2001) (cited approvingly in <u>Selig</u>). Instead, "individuals are similarly situated when they have similar jobs and display similar conduct." <u>Hawn v. Exec. Jet Mgmt. Inc.</u>, 615 F.3d 1151, 1160 (9th Cir. 2010) (citing <u>Vasquez v. Cnty. of Los Angeles</u>, 349 F.3d 634, 641 (9th Cir. 2003) (finding employee not similarly situated if he "did not engage in problematic conduct of comparable seriousness" to plaintiff's conduct)).

Under the <u>McDonnell Douglas</u> framework, once a plaintiff succeeds in presenting a prima facie case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision. <u>Noyes v. Kelly Servs.</u>, 488 F.3d 1163, 1168 (9th Cir. 2007). "Should the defendant carry its burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination." <u>Id.</u>

<u>Jinadasa v. Brigham Young Univ. - Haw.</u>, CIVIL NO. 14-00441 SOM/KJM, 2016 WL 6645767, at *3 (D. Hawai`i Nov. 9, 2016) (emphasis and some alterations in <u>Jinadasa</u>).

A.    **Hostile Work Environment**

The Court first notes, because of some of the language of the Complaint, Count I could be construed as based in part on a hostile work environment theory. This Court has previously stated:

15

> In order to prevail on a hostile work environment
> claim, a plaintiff is "required to establish a
> pattern of ongoing and persistent harassment
> severe enough to alter the conditions of
> employment." Dawson v. Entek Int'l, 630 F.3d 928,
> 939 (9th Cir. 2011).  To satisfy this requirement,
> a plaintiff must establish that "the conduct at
> issue was both objectively and subjectively
> offensive: he must show that a reasonable person
> would find the work environment to be 'hostile or
> abusive,' and that he in fact did perceive it to
> be so." Dawson, 630 F.3d at 938 (quoting Faragher
> v. City of Boca Raton, 524 U.S. 775, 787, 118 S.
> Ct. 2275, 141 L. Ed. 2d 662 (1998)). . . .

U.S. E.E.O.C. v. Glob. Horizons, Inc., 904 F. Supp. 2d 1074, 1085

(D. Hawai`i 2012) (some citations and internal quotation marks

omitted).

The Complaint does allege that Ms. Windrath: repeatedly

harassed Plaintiff by questioning Plaintiff's understanding of

work directives; and "yelled and communicated with her in a

hostile manner," although Ms. Windrath did not communicate with

non-Chinese employees in that manner.  [Complaint at ¶¶ 8, 10.]

However, the factual allegations of Complaint, if proven, would

not support a finding that this harassment was so severe as to

alter the terms of Plaintiff's employment.  See Dawson, 630 F.3d

at 939.  This Court therefore does not construe Count I as

alleging a discrimination claim based on a hostile work

environment.

**B.** **Direct and Circumstantial Evidence**

As previously noted, a plaintiff responding to a motion for summary judgment is not required to rely on the McDonnell Douglas analysis.  The plaintiff "may instead respond by producing evidence demonstrating that a discriminatory reason more likely than not motivated his employer." Lalau v. City & Cty. of Honolulu, 938 F. Supp. 2d 1000, 1011 (D. Hawai`i 2013) (citing Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2013); McGinest v. GTE Service Corp., 360 F.3d 1103, 1122 (9th Cir. 2004)).  This district court has stated:

> When a plaintiff does not rely on the McDonnell Douglas framework to oppose a summary judgment motion, but seeks to establish her case through the submission of actual evidence, "very little such evidence is necessary to raise a genuine issue of material fact regarding an employer's motive[.]" Lowe [v. City of Monrovia], 775 F.2d [998,] 1009 [(9th Cir. 1985), *amended by* 784 F.2d 1407 (9th Cir. 1986)]. . . .
>
> For an employee to meet this burden, the Ninth Circuit has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." Dominguez–Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1039 (9th Cir. 2005).  Relying on a supervisor's single discriminatory comment is consistent with "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." McGinest, 360 F.3d at 1112.  "[W]hen a court too readily grants summary judgment, it runs the risk of providing a protective shield for discriminatory behavior that our society has

17

determined must be extirpated." Id. When a plaintiff has established a prima facie inference of disparate treatment though direct or circumstantial evidence of discriminatory intent[8] — even if the employer has a legitimate, nondiscriminatory reason for taking the adverse employment action — she "will **necessarily** have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision." Cordova [v. State Farm Ins. Cos.], 124 F.3d [1145,] 1150 [(9th Cir. 1997)] (emphasis in original).

Machado v. Real Estate Res., LLC, Civil No. 12-00544 RLP, 2013 WL 3944511, at *5 (D. Hawai`i July 30, 2013) (some alterations in Machado) (some citations omitted). In Machado, this district court also explained:

> Direct evidence is "evidence which, if believed proves the fact [of discriminatory animus] without inference or presumption." Vasquez, 349 F.3d at 640 (quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (alteration in original)). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Dominguez-Curry, 424 F.3d at 1038 (quoting Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005)). Circumstantial evidence, on the other hand, "is evidence that requires an additional inferential step to demonstrate discrimination." Coghlan, 413 F.3d at 1095. . . .

Id. at *6 (some alterations in Machado).

---

[8] "'Direct evidence is evidence which, if believed, proves the fact without inference or presumption.'" Lalau, 938 F. Supp. 2d at 1013 (quoting Brown v. E. Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993)).

Plaintiff testified at her deposition that Ms. Windrath said over a hundred times that Chinese people were "nasty," and that every Clerk under Ms. Windrath's supervision during the time Plaintiff worked for Defendant heard the statement. [Def.'s CSOF, Decl. of Counsel at ¶ 4; Suppl. to Def.'s CSOF, filed 3/8/17 (dkt. no. 56), Exh. 19 (excerpts of trans. of Pltf.'s 3/1/17 depo. ("Pltf. Depo.")) at 145-47.[9]] Plaintiff also testified that Ms. Windrath: said "Chinese food is like doo-doo"; said Chinese people were "bad"; and made other comments that Plaintiff did not repeat during the deposition because they were things she "would never want to say out loud." [Pltf. Depo. at 147.] Further, according to Plaintiff, Ms. Windrath "always complained about Chinese people." [Id. at 203.] When Plaintiff first started working with her, Ms. Windrath would make fun of the Clerks who were Chinese, believing that they would not complain. [Id. at 204.] Ms. Windrath denies making the statements Plaintiff attributes to her, and she asserts that she "never made derogatory remarks about Chinese people or immigrants in the workplace." [Windrath Decl. at ¶ 66.]

---

[9] Defendant filed the supplement to Defendant's CSOF because counsel inadvertently omitted Exhibit 19 during the filing of Defendant's CSOF. [Suppl. to Def.'s CSOF at 2.]

Viewing the record in the light most favorable to Plaintiff,[10] this Court finds that some of the statements that Plaintiff described during her deposition constitute direct evidence which raises a genuine issue of fact as to whether Ms. Windrath had a discriminatory animus toward Chinese Clerks. However, this does not necessarily constitute "direct evidence that [Ms. Windrath] subjected [Plaintiff] to any adverse employment action because of that discriminatory mindset." See Lalau, 938 F. Supp. 2d at 1013–14.

According to Plaintiff, Ms. Windrath made the comment that Chinese people were "nasty" throughout Plaintiff's employment. The temporal proximity between these statements and the extension of Plaintiff's probation and her ultimate termination is circumstantial evidence which Plaintiff contends shows that the decisions were made because of her national origin. Plaintiff also described the following incidents in which she asserts she was subjected to adverse employment actions because of her national origin:

-When Plaintiff's trainer was unavailable, she was not provided with another trainer, but when Nicole's – another Clerk who was in training at the same time as Plaintiff – trainer was

_____

[10] The Ninth Circuit has stated, "[w]e review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact . . . ." Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013) (citations and quotation marks omitted).

unavailable, Nicole was provided with a substitute trainer.
[Pltf. Depo. at 175-77.]

-At Plaintiff's first of several training stations, she was not
given instruction sheets, but other Clerks in training were
provided with instruction sheets. [Id. at 181-82.]

-When Plaintiff complained to Ms. Windrath that the chair at her
station was broken, Ms. Windrath did not have the chair
changed, but when other employees – including Nicole – made
similar complaints, their chairs were changed immediately.
[Id. at 186-89.]

-Plaintiff could not access her email to view her electronic pay
stub because no one would train her on how to use the
system. Everyone else had training from "Tiffany," but
Tiffany would not train Plaintiff. [Id. at 190-93.]

Plaintiff testified that she believes Nicole was treated better

than she was because of the chair incident, the provision of a

substitute trainer for Nicole, Nicole's progress through the

training stages, and the fact that Nicole passed probation after

six months while Plaintiff did not. When Nicole and Plaintiff

were working with the same trainer, the trainer spent more time

with Nicole. Nicole also stayed in the photo station – which

requires the Clerk to be on her feet – for two or three days

while Plaintiff was there for two to three weeks. Plaintiff's

position appears to be that Nicole progressed through the

training stations more quickly and more smoothly than Plaintiff

did. [Id. at 194-201.] Plaintiff denied that Nicole's progress

was attributable to the fact that Nicole was able to learn tasks

faster than Plaintiff was, and Plaintiff testified that Nicole

made "[a] lot of errors." [Id. at 200-01.] According to

Plaintiff, Nicole was late to work several times, while Plaintiff

was never late, and Plaintiff did not make as many errors as

Nicole did.  [Id. at 201-02.]  However, Plaintiff also testified:

> A.   Later on I figure out all the new employees
> have the same process as Nicole.  But I have the
> same order as the person who [Ms. Windrath] fired
> before me.
>
> Q.   I'm going to try to decipher what you just
> said.  Are you saying that you think because you
> had the same order of stations of somebody that
> was fired before you that you both are being
> discriminated against?
>
> A.   I don't know her, but to me it is.
>
> Q.   Because she had the same order and she was
> fired?
>
> A.   Yeah.  Because she was almost same order as
> me.

[Id. at 198.]  Plaintiff asserted that all of the Clerks hired

after Plaintiff were treated better than she was because they all

had the same training process that Nicole did.  [Id. at 205-06.]

Plaintiff believes that Ms. Windrath treated Nicole

better than she treated Plaintiff because Nicole: brought gifts

to Ms. Windrath; had a relative or friend who was in a management

position above them; and is Caucasian.  [Id. at 202-03.]

According to Plaintiff, when talking about the Clerks'

interviews, Ms. Windrath said that she did not like Chinese

people and that she liked Caucasians.  [Id. at 204.]

While it is undisputed that the termination of Plaintiff's employment was an adverse employment decision, some of the incidents Plaintiff relies upon to support her disparate treatment claim may not be.

> The Supreme Court has held that Title VII's prohibition on discrimination "not only covers 'terms' and 'conditions' in the narrow sense, but evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998) (quotation marks and citation omitted). The Ninth Circuit defines "adverse employment action" broadly. <u>See Fonseca v. Sysco Food Servs. of Arizona, Inc.</u>, 374 F.3d 840, 847 (9th Cir. 2004). However, not every employment decision is an adverse employment action. For example, ostracism is not, by itself, enough to show an adverse employment decision. <u>See Strother v. S. California Permanente Med. Grp.</u>, 79 F.3d 859, 869 (9th Cir. 1996). Instead, the Ninth Circuit has stated that adverse employment actions must materially affect the compensation, terms, conditions, or privileges of employment. <u>See Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1089 (9th Cir. 2008) (quotation marks and citations omitted). Thus, assigning more or more burdensome work may be an adverse employment action. <u>Id.</u> Similarly, a reduction in pay, transfer of job duties, or undeserved performance ratings may also be an adverse employment action. <u>See Fonseca</u>, 374 F.3d at 847.

<u>Jinadasa v. Brigham Young Univ. - Hawaii</u>, CIVIL NO. 14-00441 SOM/BMK, 2016 WL 355470, at *3 (D. Hawai`i Jan. 25, 2016). However, even if all incidents Plaintiff relies upon are assumed to constitute adverse employment decisions, Plaintiff still has not identified sufficient direct and circumstantial evidence to

survive summary judgment.

Even if it is assumed, for purposes of this Motion, that Ms. Windrath made the statements attributed to her, Plaintiff has only offered circumstantial evidence as to the issue of whether Ms. Windrath subjected Plaintiff to adverse employment actions because of Ms. Windrath's discriminatory animus toward Chinese Clerks.

> The Ninth Circuit has said that, when a plaintiff opts not to rely on the McDonnell Douglas framework but instead to produce evidence that an employer likely acted for a discriminatory reason, it does not matter whether the evidence is direct or circumstantial. Thus, in McGinest, the Ninth Circuit said, "In Costa [v. Desert Palace, Inc., 539 U.S. 90, 123 S. Ct. 2148 (2003)], the Supreme Court held that circumstantial and direct evidence should be treated alike, noting: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" 360 F.3d at 1122 [(quoting Costa, 123 S. Ct. at 2154)]. However, the Ninth Circuit has also said that "[o]ur circuit has not clearly resolved" whether, when evidence of discriminatory animus is circumstantial, the evidence must be "specific" and "substantial," a standard inapplicable to direct evidence. Davis v. Team Elec. Co., 520 F.3d 1080, 1091 (9th Cir. 2008).

> After the Supreme Court decided Costa in 2002, the Ninth Circuit, in Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006), said that "in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." But in other post-Costa cases, the Ninth Circuit required circumstantial evidence of pretext to be "specific" and "substantial." Davis, 520 F.3d at

24

> 1091 n.6 (citing <u>Dominguez–Curry v. Nev. Transp.</u>
> <u>Dep't</u>, 424 F.3d 1027, 1038 (9th Cir. 2005), as an
> example of a case in which the higher standard was
> required). Thus, when a plaintiff's evidence is
> circumstantial, a court may have to determine
> whether the evidence is specific and substantial.

<u>Lalau</u>, 938 F. Supp. 2d at 1014–15 (some alterations in <u>Lalau</u>).

Lalau was Samoan male who was a liquor investigator for the

Honolulu Liquor Commission. <u>Id.</u> at 1005. According to Lalau,

the chief investigator and an administrator "stated that they

need to make the office safe from [him] because [he] was just a

typical Samoan." <u>Id.</u> at 1006 (internal quotation marks omitted).

Similar to the instant case, the district court noted that Lalau

presented direct evidence of discriminatory animus and

circumstantial evidence that the animus influenced an adverse

employment action. The district court stated: "[e]ven if a

hybrid is treated as entirely circumstantial, Lalau offers

evidence from which a jury could infer that animus toward Samoans

influenced the City's actions." <u>Id.</u> at 1015. Relying on <u>Davis</u>,

520 F.3d 1080, the district court concluded that the "typical

Samoan" comment passed the "specific and substantial' standard"

because it was "made by the plaintiff's supervisor or by a person

who makes a decision as to an adverse employment action." <u>Id.</u>

Similarly, in <u>Machado</u>, the plaintiff was an escrow

manager for a real estate brokerage office. She was originally

from Indonesia, and English was her second language. 2013 WL

3944511, at *1. According to Machado, the defendant's Vice President of Operation informed her that he decided to terminate her employment "because of her 'strong accent' because her accent 'would not let [her] be successful with their company.'" Id. This district court concluded that this evidence – although disputed – was "'specific' and 'substantial' because the statement was (1) made directly to Plaintiff by her supervisor, (2) as a basis for the adverse employment action, and (3) is inextricably intertwined with Plaintiff's national origin." Id. at *9.

In the instant case, Plaintiff has presented evidence that Ms. Windrath – her supervisor and the person who made the recommendation to terminate her employment – made statements that show a discriminatory animus against Chinese people. Thus, they were inextricably intertwined with Plaintiff's national origin. However, Plaintiff's evidence also shows that the Ms. Windrath's statements were general comments; Plaintiff has not presented evidence that Ms. Windrath made the statements directly to Plaintiff. Even if Ms. Windrath did make the statement directly to Plaintiff, to the extent that Defendant took adverse employment actions against Plaintiff – including, but not limited to, terminating her employment – she has not presented any evidence that the discriminatory statements were a basis for the adverse employment actions taken against her. Although there are

26

some similarities between the evidence presented in the instant case and evidence presented in cases like <u>Lalau</u> and <u>Machado</u>, significant differences exist. The evidence Plaintiff presents in the instant case does not constitute specific and substantial evidence supporting her claim that she was discriminated against based on her national origin. To the extent that Plaintiff relies on a hybrid of direct and circumstantial evidence of disparate treatment, Plaintiff fails to raise a genuine issue of material fact for trial.

### B. **McDonnell Douglas Analysis**

#### 1. **Prima Facie Case**

Plaintiff may also establish her disparate treatment claim through the <u>McDonnell Douglas</u> burden-shifting framework. <u>See</u> <u>Surrell</u>, 518 F.3d at 1105. Plaintiff has satisfied the first two elements of her prima facie case: she is a member of a protected class because her national origin is Chinese; [Complaint at ¶ 3; Pltf. Depo. at 145;] and she had the basic qualifications for the Clerk position, as evidenced by the fact that Defendant hired her and she satisfactorily completed her first three-month probationary period, [Def.'s CSOF at ¶ 1; Second Supplement, Exh. 5 (Three-Month PPER)].

As to the third element, the record includes evidence of two adverse employment decisions – the extension of Plaintiff's probationary period and her termination. <u>See</u> Def.'s

CSOF at ¶¶ 13, 15.  Plaintiff also testified that she: was not provided with a substitute trainer when hers was unavailable; she was not given instruction sheets for some of the training stations she was assigned to; her broken chair was not replaced as quickly as another employee's; she was not provided with training on the use of the office email system; and her progress through the Clerks' training stations was slower than other Clerks.  [Pltf. Depo at 177-77, 181-82, 186-201.]  However, there is insufficient evidence in the current record to support a finding that any of these purported employment decisions "materially affect[ed] the compensation, terms, conditions, or privileges of [Plaintiff's] employment."  See Davis, 520 F.3d at 1089.  Thus, for purposes of the McDonnell Douglas analysis, this Court will only consider the extension of Plaintiff's probationary period and her termination.

As to the fourth element of her prima facie case, Plaintiff points to "Nicole," a Caucasian Clerk who was in training at the same time Plaintiff was.  [Pltf. Depo. at 175-76, 203.]  Unlike Plaintiff, Nicole passed probation after six moths, even though – according to Plaintiff – Nicole was late to work several times, while Plaintiff never was.  [Id. at 201-02.]  Further, Plaintiff saw Nicole make "[a] lot of errors," while Plaintiff made "some.  But not much."  [Id. at 200-01.]  Viewing the record in the light most favorable to Plaintiff, she has

established that a comparable employee outside of her protected class did not suffer the adverse employment decisions she did. Thus, Plaintiff has established all of the elements of her prima facie case.

### 2. <u>Legitimate, Nondiscriminatory Reason</u>

The burden therefore shifts to Defendant to establish a "legitimate, nondiscriminatory reason" for its extension of Plaintiff's probationary period and her termination. <u>See</u> <u>Noyes</u>, 488 F.3d at 1168. Ms. Windrath states that, "[d]uring Plaintiff's second three months of probation (9/13 to 12/13), she made numerous errors including the same error numerous times and errors related to matters she was fully trained on. [Ms. Windrath] also received complaints about customer service and rudeness with co-workers." [Windrath Decl. at ¶ 35.] Ms. Windrath describes the errors and complaints in her declaration, and Defendant submitted the documentation of her counseling sessions with Plaintiff. [<u>Id.</u> at ¶¶ 36-45; Second Supplement, Exhs. 7-10.] Defendant also submitted the documents and/or records that Ms. Windrath provided to Plaintiff during the counseling sessions to show Plaintiff her errors. [Windrath Decl., Exh. 16.]

At the end of Plaintiff's six-month probationary period, in spite of Plaintiff's errors, Ms. Windrath still believed Plaintiff had the potential to succeed in the position

29

and "recommended [Plaintiff] be given an extended probationary period to overcome her performance deficiencies and be given a final chance to improve." [Windrath Decl. at ¶ 46.] Ms. Windrath states that she previously "recommended termination for under-performing employees at the conclusion of the six (6) month probationary period." [Id. at ¶ 47.] Defendant submitted the Six-Month PPER for another Clerk who was scheduled to complete her probationary period on October 31, 2013. Ms. Windrath rated the Clerk's performance as substandard overall and in each individual category, and she recommended that the Clerk be terminated. [Second Supplement, Exh. 11.] Further, as previously noted another Clerk hired in 2013, who was of Filipino descent, also had his probationary period extended based on unsatisfactory performance. [Windrath Decl. at ¶ 26.] Even viewing the record in the light most favorable to Plaintiff, Defendant has carried its burden to present a legitimate, nondiscriminatory reason for the extension of Plaintiff's probationary period.

During Plaintiff's extended probationary period, she "continued to make errors, including repeated errors for which she was previously counseled." [Id. at ¶ 49.] Ms. Windrath describes these errors in her declaration, and Defendant submitted the documentation of her counseling sessions with Plaintiff. [Id. at ¶¶ 50-56; Second Supplement, Exhs. 12-15.]

Defendant also submitted the documents and/or records that Ms. Windrath provided to Plaintiff during the counseling sessions after the extension of her probation to show Plaintiff her errors. [Windrath Decl., Exh. 16.] Further, Ms. Windrath states that, "[i]n January of 2014, [she] received a petition from Plaintiff's co-workers indicating she was difficult to work with and rude." [Windrath Decl. at ¶ 69; Second Supplement, Exh. 18 (petition).] Ms. Windrath neither initiated the petition nor solicited the signatures on it. [Windrath Decl. at ¶ 69.] Ultimately, "[i]n February 2014, [Ms. Windrath] recommended . . . that Plaintiff be terminated because she continued making errors, many errors she had made previously and was counseled on, she did not improve her relationship with her co-workers, she was argumentative and combative to supervisors, co-workers and customers." [Id. at ¶ 57, Exh. 17 at 2 (Nine-Month PPER recommending termination).] Even viewing the record in the light most favorable to Plaintiff, Defendant has carried its burden to present a legitimate, nondiscriminatory reason for the termination of Plaintiff's employment.

### 3. **Pretext**

Thus, the burden shifts back to Plaintiff to raise a triable issue of fact as to whether Defendant's reasons for the extension of her probation and her termination were merely pretext for unlawful discrimination. See Noyes, 488 F.3d at

1168.

> An employee can prove pretext either:
> (1) "directly, by showing that unlawful
> discrimination more likely motivated the
> employer"; or (2) "indirectly, by showing that the
> employer's proffered explanation is unworthy of
> credence because it is internally inconsistent or
> otherwise not believable." <u>Fonseca v. Sysco Food
> Servs. of Ariz., Inc.</u>, 374 F.3d 840, 849 (9th Cir.
> 2004) (internal quotation marks omitted). . . .

<u>Mayes v. WinCo Holdings, Inc.</u>, 846 F.3d 1274, 1280 (9th Cir.

2017) (some citations omitted). In order to survive summary

judgment, the plaintiff must show that a genuine issue of

material fact exists regarding pretext, either directly or

indirectly. <u>See</u> <u>id.</u>

Plaintiff's work performance in the period leading up

to her Six-Month PPER and her Nine-Month PPER is well-documented.

However, Plaintiff contests parts of her EPEWs and PPERs. For

example, Plaintiff alleges that some of the reports in her

personnel file have been falsified. After Ms. Windrath made a

complaint about Plaintiff being rude to a customer, "Alan"

offered to train Plaintiff. According to Plaintiff, although a

report in her file states that she failed to change after Alan

coached her, Alan did not actually do any coaching with her.

[Pltf. Depo. at 185.] Even construing the record in the light

most favorable to Plaintiff, she has not identified sufficient

evidence to raise a triable issue of fact as to whether

Defendant's explanation that it terminated her employment based

on substandard performance "is unworthy of credence because it is internally inconsistent or otherwise not believable." <u>See Fonseca</u>, 374 F.3d at 849.

The closer question is: has Plaintiff raised a triable issue of fact as to whether unlawful discrimination motivated Defendant's termination of her employment?  Plaintiff has presented evidence that Ms. Windrath had a discriminatory animus against Chinese Clerks but the record, even viewed in the light most favorable to Plaintiff, falls short of raising a genuine issue of fact for trial as to whether Ms. Windrath's discriminatory animus more likely than not motivated both her recommendation to terminate Plaintiff's employment, and Defendant's ultimate decision to terminate Plaintiff's employment.

This Court therefore finds that Plaintiff failed to raise a genuine issue of fact for trial regarding pretext, either directly or indirectly.

C.  <u>**Summary**</u>

Plaintiff has failed to raise a triable issue of fact as to her Title VII national origin discrimination claim either based on direct and circumstantial evidence or under the <u>McDonnell Douglas</u> framework.  Defendant is therefore entitled to judgment as a matter of law as to Plaintiff's Title VII national origin discrimination claim.  <u>See</u> Fed. R. Civ. P. 56(a) ("The

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The Motion for Summary Judgment is granted as to Count I.

## III. IIED Claim

This district court has recognized that:

> Courts have similarly determined that IIED claims arising out of employment discrimination are barred by [Haw. Rev. Stat.] § 386-5. In Yang v. Abercrombie & Fitch Stores, the Hawaii Intermediate Court of Appeals ("ICA") held that the exclusivity provision of Hawaii's Workers' Compensation Law bars IIED claims that do not relate to sexual harassment or sexual assault. 284 P.3d 946, 950, 955-56 (Haw. Ct. App. 2012). The Ninth Circuit has also ruled that an IIED claim related to employment discrimination is barred by the exclusivity provision. See Courtney v. Canyon Television & Appliance Rental, Inc., 899 F.2d 845, 851 (9th Cir. 1990).

> Courts in this district, including this Court, have reached the same determination, holding that IIED claims not based on sexual harassment or sexual assault are barred by Hawaii's Worker's Compensation Law. See, e.g., Kuehu v. United Airlines, Inc., Civ. No. 16-00216 ACK-KJM, 2016 WL 4445741, at *8 (D. Haw. Aug. 23, 2016); Souza v. Silva, Civ. No. 12-00462 HG-BMK, 2014 WL 2452579, at *16 (D. Haw. May 30, 2014); Chang v. Straub Clinic & Hosp., Inc., Civ. No. 12-00617 DKW-RLP, 2014 WL 47947, at *9 (D. Haw. Jan. 7, 2014), reconsideration denied, Civ. No. 12-00617 DKW, 2014 WL 712613 (D. Haw. Feb. 21, 2014). . . .

Klingman v. Cty. of Maui, Civ. No. 16-00399 ACK-RLP, 2016 WL 6996986, at *6-7 (D. Hawai`i Nov. 29, 2016).

In the instant case, Plaintiff's IIED claim arises out of alleged employment discrimination on the basis of her national origin and because she made complaints about the national origin discrimination.  Because her IIED claim does not relate to either sexual harassment or sexual assault, the claim is barred by § 386-5.  There are no genuine issues of fact relevant to Plaintiff's IIED claim and Defendant is entitled to judgment as a matter of law as to Count II.

Dismissal of Count II does not preclude Plaintiff from seeking damages for emotional distress as part of her remaining Count III claim.  See Klingman, 2016 WL 6996986, at *7.

## IV.  **Title VII Retaliation Claim**

At the outset, this Court notes that Plaintiff brings her retaliation claim pursuant to 42 U.S.C. § 12203.  [Complaint at ¶ 28.]  However, § 12203(a) prohibits retaliation against individuals who oppose acts or practices prohibited by Title 42, Chapter 126.  Chapter 126 is titled "Equal Opportunity for Individuals with Disabilities."  Neither the evidence in the current record nor the allegations of the Complaint indicate that Plaintiff is an individual with disabilities.  Although Count III expressly invokes § 12203, it is apparent to the Court – reading the Complaint as a whole – that this was an error.  The Court construes Count III as alleging a Title VII retaliation claim

pursuant to 42 U.S.C. § 2000e-3(a).[11]

As with the disparate treatment discrimination claim,
Plaintiff can establish her Title VII retaliation claim either
through direct evidence or through the McDonnell Douglas
analysis.  See Black v. Correa, Civil No. 07-00299 DAE-LEK, 2009
WL 1789294, at *18 (D. Hawai`i June 22, 2009) (some citations
omitted) (citing Vasquez v. County of Los Angeles, 349 F.3d 634,
640 (9th Cir. 2003)).  "The elements of a prima facie retaliation
claim are, (1) the employee engaged in a protected activity,
(2) she suffered an adverse employment action, and (3) there was
a causal link between the protected activity and the adverse
employment action."  Davis v. Team Elec. Co., 520 F.3d 1080,
1093-94 (9th Cir. 2008).  "Protected activity includes the filing
of a charge or a complaint, or providing testimony regarding an
employer's alleged unlawful practices, as well as engaging in
other activity intended to oppose an employer's discriminatory
practices."  Raad v. Fairbanks N. Star Borough Sch. Dist., 323
F.3d 1185, 1197 (9th Cir. 2003) (brackets, citation, and internal

_____

[11] Section 2000e-3(a) states, in pertinent part:

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his
> employees . . . because he has opposed any
> practice made an unlawful employment practice by
> this subchapter, or because he has made a charge,
> testified, assisted, or participated in any manner
> in an investigation, proceeding, or hearing under
> this subchapter.

quotation marks omitted).

Plaintiff made complaints to "Alan" and Rick Akase about the way that Ms. Windrath treated her. When she made the complaint to Rick, "Radford" was also present. [Pltf. Depo. at 148.] Radford Cameros was Ms. Windrath's direct supervisor in February 2014, when Ms. Windrath recommended to Mr. Cameros and Mr. Akase that Plaintiff be terminated. [Windrath Decl. at ¶ 57.] Thus, there is sufficient evidence in the record to establish the first element of Plaintiff's prima facie case – that she engaged in protected activity. As previously noted, Plaintiff's termination constitutes an adverse employment action.

As with Plaintiff's disparate treatment claim, very little evidence is necessary to raise a triable issue of fact regarding Defendant's motive for her termination. See Lowe, 775 F.2d at 1009. "[A]ny indication of discriminatory motive – including evidence as diverse as the [defendant's] reaction, if any, to [plaintiff's] legitimate civil rights activities . . . – may suffice to raise a question that can only be resolved by a factfinder." Id. (some alterations in Lowe).

According to Plaintiff, Ms. Windrath threatened to terminate her employment if she continued complaining about discrimination, requesting reevaluation, and "talk[ing] bad about [Ms. Windrath] to other people." [Pltf. Depo. at 174.] Plaintiff testified that Ms. Windrath made this threat more than

ten times, but less than twenty times. [Id. at 173-74.]

Ms. Windrath states that, until approximately one month after she

recommended Plaintiff's termination, she did not know that

Plaintiff made a complaint alleging that she discriminated

against Plaintiff because Plaintiff is Chinese. [Windrath Decl.

at ¶ 65.]

Plaintiff's testimony about Ms. Windrath's statements

is specific and substantial evidence of Defendant's motive for

her termination because the statements were: made directly to

Plaintiff by her supervisor; reflected the basis for the adverse

employment action that occurred thereafter; and were

"inextricably intertwined with" Plaintiff's protected activity.

See Machado, 2013 WL 3944511, at *9. Plaintiff has therefore

established the third element of her prima facie case through

direct evidence. Further, even though Defendant has presented

evidence of a legitimate, nondiscriminatory reason for

Plaintiff's termination, Plaintiff's direct evidence of a

retaliatory motive for her termination "**necessarily** . . .

raise[s] a genuine issue of material fact with respect to the

legitimacy or bona fides of the employer's articulated reason for

its employment decision." See Cordova, 124 F.3d at 1150

(emphasis in Cordova). Because Plaintiff has raised a genuine

issue of material fact as to the portion of her retaliation claim

based on her termination, Defendant's Motion for Summary Judgment

is denied as to that portion of Count III.

As previously noted, the extension of Plaintiff's probationary period was also an adverse employment action, but Plaintiff has not established that the other actions she bases her claims upon constitute adverse employment actions. Plaintiff has not presented any evidence which suggests that there was a causal link between the extension of her probationary period and her complaints about national origin discrimination. Plaintiff has therefore failed to establish her prima facie case as to the portions of her retaliation claim based on either the extension of her probationary period or any other alleged adverse employment action. Defendant is entitled to judgment as a matter of law as to those portions of Count III.

## CONCLUSION

On the basis of the foregoing, Plaintiff's Motion for Leave to File Late Opposition to Defendant's Motion for Summary Judgment Filed on March 8, 2017, which Plaintiff filed April 14, 2017, is HEREBY DENIED, and Defendant's Motion for Summary Judgment, filed March 8, 2017, is HEREBY GRANTED IN PART AND DENIED IN PART. This Court GRANTS summary judgment in favor of Defendant as to Counts I and II of Plaintiff's Complaint, filed December 22, 2014, DENIES the Motion for Summary Judgment as to the portion of Count III alleging that Plaintiff's termination was retaliatory, and GRANTS summary judgment in favor of

Defendant as to all other portions of Count III.

        IT IS SO ORDERED.

        DATED AT HONOLULU, HAWAII, July 14, 2017.



           /s/ Leslie E. Kobayashi
           Leslie E. Kobayashi
           United States District Judge

QIN LI VS. CITY AND COUNTY OF HONOLULU; CIVIL 14-00573 LEK-RLP;
ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE LATE
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT FILED ON
MARCH 8, 2017; AND GRANTING IN PARTY AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT